Dr. Ben S. BRANCH, as Trustee of Bank of New England Corporation, and derivatively on behalf and in the name of Connecticut Bank and Trust Company, N.A. and Maine National Bank, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Federal Deposit Insurance Corporation, in its capacity as receiver for Bank of New England, N.A., Connecticut Bank & Trust Company, N.A., Maine National Bank, Federal Deposit Insurance Corporation, in its capacity as receiver for New Bank of New England, N.A., New Connecticut Bank & Trust Company, N.A., and New Maine National Bank, and Fleet Bank of Massachusetts, N.A., Fleet Bank, N.A., and Fleet Bank of Maine Defendants.

Civ. A. Nos. 91–10976–Y, 92–10091–Y, 92–10807–Y, 92–10904–Y and 92–12091–Y.

United States District Court,
D. Massachusetts.

Sept. 10, 1993.

should run consecutively, § 5G1.3(a), thereby reflecting the independent criminal character of each offense.

Richard Hiersteiner, Palmer & Dodge, Boston, MA, for John L. Whitlock.

Hugh M. Ray, Andrews & Kurth, Dallas, TX, Van Oliver, Andrews & Kurth, Houston, TX, for Ben Branch.

Jon D. Schneider, Goodwin, Proctor & Hoar, Deborah S. Griffin, Peabody & Arnold, Boston, MA, for New Bank of New England, N.A., New Connecticut Bank & Trust Co., N.A., New Maine National Bank, and F.D.I.C.

William W. Abendroth, Boston, MA, for Fleet Bank–NH.

Deborah S. Griffin, Peabody & Arnold, Boston, MA, Thomas A. Schulz, Charles L. Cope, II, Tom K. Reeves, Susan K. Bank, Marta W. Berkley, Steven M. Kaufman, Wendy Kloner, F.D.I.C., Washington, DC, for F.D.I.C.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This matter originally came before the Court upon the Defendants' motion to dismiss, based upon a variety of grounds, filed with the Court on May 11, 1992. On May 24, 1993, the Court severed consideration of, and requested further argument and affidavits on, the argument of the defendant Federal Deposit Insurance Corporation as Receiver ("FDIC–Receiver")[1] that certain of the claims of the plaintiff trustee Ben S. Branch ("Branch") should be dismissed against it based on the Branch's failure to exhaust administrative remedies under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). *See* 12 U.S.C. § 1821(d)(3)–(6). The remainder of the Defendants' motions were granted in part and denied in part on June 22, 1993, *see Branch v. Federal Deposit Ins. Corp.*, 825 F.Supp. 384 (D.Mass.1993). After reviewing the requested additional arguments and affidavits, this memorandum and order addresses the remaining portion of FDIC–Receiver's motion to dismiss the exhaustion issue.

## I. BACKGROUND

The facts and allegations of the case are more fully set forth in the Court's opinion issued on June 22, 1993, *see Branch*, 825 F.Supp. 384, but the Court provides a brief summary here. In the late 1980s, BNEC was a bank holding company owning numerous subsidiary corporations including the federally insured Subsidiary Banks BNE, CBT and MNB. In 1989, BNEC and its Subsid-

---

1. Defendant FDIC–Receiver is collectively comprised of the FDIC as receiver for the Bank of New England Corporation's ("BNEC's") three failed "Subsidiary Banks," Bank of New England, N.A. ("BNE"), Connecticut Bank and Trust Company, N.A. ("CBT"), and Maine National Bank ("MNB") ("FDIC–Receiver I"), and the FDIC as receiver for the three subsequent "Bridge Banks," New Bank of New England, N.A. ("New BNE"), New Connecticut Bank and Trust Company, N.A. ("New CBT"), and New Maine National Bank ("New MNB") ("FDIC–Receiver II"). Only FDIC–Receiver has moved to dismiss the Plaintiff's claims on the basis of failure to exhaust administrative remedies under FIRREA, which is appropriate since only claims against an FDIC receivership, and not claims against the FDIC in its corporate capacity or against private banks such as the Fleet Banks, are required to satisfy FIRREA's exhaustion requirements.

iary Banks fell under heavy federal regulation due to financial problems at BNE. On January 6, 1991, the Comptroller of the Currency declared all three Subsidiary Banks insolvent. The FDIC was then appointed receiver of the Subsidiary Banks, and immediately transferred the Subsidiary Banks' assets to the Bridge Banks. On the following day, BNEC filed for Chapter 7 bankruptcy. Shortly thereafter, the Bridge Banks were closed and the FDIC was appointed receiver of the Bridge Banks, and immediately transferred the Bridge Banks' assets to the Fleet Banks.

On May 28, 1991, the plaintiff Branch, Chapter 7 Trustee of BNEC, filed timely administrative claims with each of the three Subsidiary Bank receiverships seeking to recover an undetermined amount (believed to be in excess of $750,000,000) of BNEC's assets allegedly transferred downstream from BNEC to its Subsidiary Banks between late 1989 and early 1991, while both BNE and BNEC were insolvent, such that BNEC received either no value or far less than reasonably equivalent value for the transfers. The Proofs of Claims allege a pattern of such transfers, and then list various transactions through which the transfers were effected "to the extent [then] known" to Branch, including, for example (in the BNE Proof of Claim),[2] transfers of stock and equity interests, mergers of solvent banks into insolvent BNE, payments of bank expenses, transfers of cash and other liquid assets, transfers of the proceeds of sales of BNEC assets, and transfers of services.[3] The Proofs of Claim then seek recovery of all of the assets transferred downstream during BNEC's and BNE's insolvency, including but not limited to the transactions specifically identified, under both the fraudulent conveyance provisions of the Bankruptcy Code and state common law.

On November 15, 1991, the FDIC disallowed Branch's Proofs of Claim on broad legal grounds applicable to all the transfers specifically or generally described by Branch, asserting that Branch's Bankruptcy Code claims were barred by various provisions of the Bankruptcy Code and the federal banking law, and that Branch's common law claims "fail[ed] to state cognizable claims."

On January 13, 1992, Branch filed his instant Complaints, again alleging, as in his Proofs of Claim, a program of downstream asset transfers from BNEC to the Subsidiary Banks, while both BNEC and BNE were insolvent, such that BNEC received no value or less than fair consideration for the transfers. And again like the Proofs of Claim, the Complaints then list transactions through which the fraudulent transfers were allegedly effected, before seeking recovery of all assets transferred under both the Bankruptcy Code and under state common law. New to the Complaints, however, are seven additional sets of listed transactions (the "challenged transactions" or the "challenged claims") not specifically referenced in Branch's Proofs of Claim.[4]

**2.** The Court uses the BNE Proof of Claim as an example because most of the challenged transfers were made to that bank, and because the CBT and MNB Proofs of Claim are substantially similar.

**3.** The Proofs of Claim list both specific and general transactions. The BNE Proof of Claim, for example, lists eighteen specific transactions, including, for example, (i) the transfer to BNE of BNEC's $17.5 million lease with KLM Royal Dutch Airlines, (ii) the merger of Bank of New England—West, N.A. into BNE, and (iii) the transfer to BNE of proceeds from the sale of BNEC's subsidiary New England Discount Brokerage. Likewise, the BNE Proof of Claim also lists (as do the CBT and MNB Proofs of Claim with respect to those banks) three general transactions: (1) payment by BNEC of BNE expenses (with one example); (2) transfer to BNE of additional substantial sums of cash and other liquid assets (approx. $214 million [of which $203 million is left undefined] see note 8, infra); and (3) provision of services to BNE for less than market value (with several examples).

**4.** The seven omitted transactions are as follows: (1) transfer to the Subsidiary Banks of up to $108 million in 1989 federal income tax refunds received by BNEC; (2) transfer to BNE of the proceeds of sale of BNEC's "McCullagh Leasing" subsidiaries ($67 million); (3) payment by BNEC of expenses related to efforts to recapitalize BNEC and the Subsidiary Banks ($11.6 million); (4) prepayment by BNEC of insurance premiums and related expenses on behalf of the banks ($4.8 million); (5) transfer to BNE of proceeds from sale of BNEC's subsidiary New England Servicios Limitada; (6) transfer to BNE of the value of assets sold to the Bank of Tokyo (mentioned only indirectly in the BNE Proof of Claim); (7) trans-

## II. DISCUSSION

Both parties agree that this Court has jurisdiction to hear Branch's claims only to the extent that they were presented to the FDIC receiverships through timely administrative claims, and only to the extent the FDIC either disallowed the claims or failed to rule on them within 180 days. *See* 12 U.S.C. § 1821(d)(3)–(6).[5] The dispute here is whether Branch's Proofs of Claim sufficiently presented to the FDIC Branch's challenged claims based upon the seven sets of transactions specifically mentioned for the first time in his Complaints.[6]

■ Under the FIRREA claims process, creditors of a receivership are advised "to present their claims, together with proof, to the receiver." 12 U.S.C. § 1821(d)(3)(B)(i). Neither FIRREA nor its legislative history defines the term "claim," nor has the FDIC issued regulations defining or clarifying its meaning. *Heno v. Federal Deposit Ins. Corp.*, 996 F.2d 429, 433 n. 9 (1st Cir.1993). Similarly, the Court is aware of no authority defining or delineating the degree of specificity required of a "claim." The term, however, is used broadly in FIRREA, *Circle Industries v. City Fed. Sav. Bank*, 749 F.Supp. 447, 452 (E.D.N.Y.1990) (citing 12 U.S.C. § 1821[1]), *aff'd*, 931 F.2d 7 (2d Cir.1991) (per curiam), and ought be interpreted in accordance with FIRREA's purposes. *See Office & Professional Employees Int'l Union, Local 2 v. Federal Deposit Ins. Corp.*, 962 F.2d 63, 67–68 (D.C.Cir.1992).

■ As recently noted by the First Circuit, Congress plainly intended FIRREA's claims review process to provide a streamlined method for resolving the bulk of claims against failed financial institutions in a prompt, orderly fashion, without lengthy litigation. *Marquis v. Federal Deposit Ins. Corp.*, 965 F.2d 1148, 1152 (1st Cir.1992) (citing legislative history to FIRREA). Yet at the same time, Congress also intended the process to ensure a fair resolution of claims, *id.* at 1154, and thus clearly did not intend for the FIRREA claims review process to constitute a procedural barrier to thwart the claims of worthy creditors:

> We find unacceptable FDIC's suggestion that the FIRREA administrative claim procedure ... is intended to serve as an obstacle, winnowing out creditors who—despite apparent entitlement—are not sufficiently 'interested' in obtaining money due them.
>
> . . . .
>
> The primary function of the FIRREA rules, so far as we can tell, is to ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution.

*Office & Professional Employees*, 962 F.2d at 67–68 (interpreting the term "claimant" under FIRREA). Thus, to reiterate, the purposes of the FIRREA claims process are to

fer to CBT and MNB of proceeds received from the sale of the Subsidiary Banks' mutual fund custody, stock transfer, and corporate trust businesses (listed in the BNE Proof of Claim but omitted in part from the CBT Proof of Claim and omitted entirely from the MNB Proof of Claim).

FDIC–Receiver also challenges an eighth judicial "claim" referenced in both Branch's Complaints and his Proofs of Claim—a so-called "catch-all" claim reserving Branch's right to avoid "numerous other transactions" and "to assert the avoidability of any other transactions of which he becomes aware of the existence and avoidability of any such transaction." (*See, e.g.*, Mass.Compl. ¶ 94; BNE Proof of Claim, Pl.'s App. A at ¶ 10(u), (k), (*l*) & pp. 1–3, 6 n. 8, 15–16.) FDIC–Receiver argues that this catch-all claim represents an improper attempt by Branch to skirt FIRREA's exclusive claims procedures by "amending" his timely filed proofs of claim after

the bar dates have passed. Unless and until Branch attempts to assert a specific claim for relief under his catch-all claim, however, the Court sees no need to address either the catch-all claim's viability or its potential reach.

5. Branch originally claimed an exemption from the FIRREA claims process based upon the FDIC's alleged conflicts of interest with respect to the claims at issue, but subsequently declined to pursue this in light of "the development of the case law under FIRREA." (*See* Pl.'s Supp. Br. at 2 n. 1.)

6. Branch also argues that the filing deadline should be equitably tolled based upon the FDIC's alleged refusal to turn over information related to the challenged claims, but the Court need not address this issue in light of its ruling *infra* that Branch adequately exhausted his administrative remedies with respect to the challenged claims.

ensure both prompt and fair resolution of claims.

■ In identifying a claim specificity standard appropriate to furthering FIRREA's objectives, the Court gleans at least some guidance from analogous cases interpreting the claims review procedures of the Federal Tort Claims Act (FTCA)—cases cited by both Branch and the FDIC—in which the courts have consistently held that an administrative claim is sufficient if it provides the government with notice of the general nature of the claim and with sufficient information to allow it to investigate and determine whether settlement of the claim is appropriate. *See, e.g., Corte–Real v. United States,* 949 F.2d 484, 486 (1st Cir.1991); *Lopez v. United States,* 758 F.2d 806, 809–810 (1st Cir.1985); *Shipek v. United States,* 752 F.2d 1352, 1354 (9th Cir.1985). Like the FIRREA claims process, the FTCA claims procedures serve the same competing policy objectives of expediting claims processing while at the same time ensuring fairness to claimants. *Compare Marquis,* 965 F.2d 1148, 1152, 1154 (discussing FIRREA's policy objectives) *with Corte–Real,* 949 F.2d at 486 (discussing the FTCA' policy objectives), *and Shipek,* 752 F.2d at 1354 (same). While the FIRREA claims process might justifiably require some degree of greater specificity in light of the great volume of competing claims that the FDIC must necessarily expedite in order to promptly and equitably distribute a particular receivership's assets, the law has also traditionally demanded a correspondingly greater punctiliousness from claimants asserting federal tort claims under the FTCA since such claims are litigated in the shadow of sovereign immunity. *See Office & Profes-*

*sional Employees,* 962 F.2d at 67–68. Accordingly, although analogy to the FTCA claims process is perhaps not always apposite, *see, e.g., Office & Professional Employees,* 962 F.2d at 67–68 (analogy to bankruptcy rather than FTCA context is preferable for determining whether a union may sue on employees' behalf as a "claimant" or "creditor" under FIRREA), *but see also Johnson v. Home State Bank,* —— U.S. ——, ——, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) (under Bankruptcy Code, "claim" has broadest available definition), the comparison seems appropriate in this case for determining claim specificity requirements under FIRREA in light of the relatively similar policy objectives driving the claims review aspects of the two administrative processes.

■ Therefore, in consideration of FIRREA's policy objectives and by comparison to analogous cases under the FTCA, and in light of "the established rule of statutory construction that enactments limiting federal court jurisdiction are to be construed narrowly," *Heno,* 996 F.2d at 435, the Court concludes that the appropriate question for determining whether Branch adequately presented to the FDIC the challenged claims is whether Branch's administrative claims provided the particular FDIC receiverships with adequate notice of the challenged claims and with sufficient information and detail about the claims to enable the FDIC expeditiously and fairly to allow or disallow the claims. *See Office & Professional Employees,* 962 F.2d at 69.[7]

■ Branch's Proofs of Claim, although admittedly omitting specific reference to the challenged transactions, nonetheless met this standard. Branch's Proofs of Claim allege a

---

**7.** The Court notes (and the FDIC does not appear to dispute) that FIRREA, unlike the FTCA, *see* 28 U.S.C. § 2675, does not limit the size of a claimant's district court claim to the dollar amount previously presented (in the *same* claim) at the administrative level. *See Interlease Corp. v. Federal Deposit Ins. Corp.,* 837 F.Supp. 1, 3 (D.D.C. 1993). As recently explained by the United States District Court for the District of Columbia, FIRREA neither explicitly nor implicitly contains such a limitation, and FIRREA's goal of enabling the FDIC expeditiously and fairly to dispose of claims would not be furthered by such a limitation because (i) it would simply encourage claim-

ants to consistently file excessive and inaccurate administrative claims, and (ii) even in the absence of such a limitation, claimants would still have no incentive to file merely perfunctory administrative claims (and then enhanced judicial claims) because the claimants would fear that their nominal administrative claims would be granted. *See id.* Thus, even if Branch's challenged transactions increase the size of the corresponding administrative claims (which many of Branch's challenged transactions appear *not* to do, *see* next footnote *supra* [challenged claims replace certain administrative claims] ), these dollar amount enhancements remain within the letter of FIRREA.

broad pattern of downstreaming of assets from BNEC to the Subsidiary Banks, while both BNEC and BNE were insolvent, such that all transfers made during that time period, whether specifically listed or not, were made either for no value or for far less than fair consideration. The Proofs of Claim also list several transactions that directly or indirectly encompass the challenged transactions (i.e., the transfer of additional substantial sums of cash or other liquid assets from BNEC to the Subsidiary Banks, the payment by BNEC of expenses on behalf of the Subsidiary Banks, and provision by BNEC of various services to the Subsidiary Banks for less than market value),[8] as well as many other specific transactions that are substantially similar to the challenged transactions. Finally, in both his Complaints and Proofs of Claim, Branch asserts the same legal theories of recovery for all downstream transfers.[9]

For these reasons, the two primary cases advanced by the FDIC are easily distinguished. In *Coleman v. Federal Deposit Ins. Corp.*, 826 F.Supp. 31 (D.Mass.1993) (Harrington, J.), the plaintiffs had filed a timely administrative claim with the FDIC, acting as receiver for First Mutual Bank for Savings ("First Mutual"), alleging various contract and tort claims arising from the breach by First Mutual of two agreements, a workout agreement related to a defaulted loan for the development of a condominium project and a forbearance agreement related to several other defaulted loans. *Id.* at 32. After their administrative claim was disallowed by the FDIC, the plaintiffs filed suit in federal court seeking recovery for the breaches of contract alleged in their administrative claim as well as for eight additional counts based upon new allegations that First Mutual had taken control of the condominium project, had coerced the plaintiffs to make payments and give additional collateral on the condominium loan, and had impaired the value of the collateral securing the loan. *Id.* Since the eight additional counts asserted "entirely new causes of action based on entirely new facts," the court dismissed the additional claims for lack of subject matter jurisdiction. *Id.* In this case, however, Branch's challenged claims are based upon the same general set of facts as were his administrative claims and Branch seeks recovery under precisely the same legal causes of action.

Similarly, in *Hibyan v. Federal Deposit Ins. Corp.*, 812 F.Supp. 271 (D.Me.1993), the plaintiff, a former president of Maine Savings Bank ("MSB"), had filed a claim with the FDIC (after MSB failed) for recovery of two years salary and benefits under a provision in his employment contract which provided for such payment in the event of his termination within three years of certain specified "change in control events." *Id.* at 273. After his administrative claim was disallowed by the FDIC, the plaintiff then filed suit in federal court seeking relief not only under the "change in control events" provision in his employment contract, but also under an independent "no compete" clause in the contract. *Id.* Presumably because the "no compete" claim asserted an entirely separate contractual theory of recovery based upon an independent contractual provision, the court granted the FDIC's motion for summary

---

8. The Court finds particularly significant the fact that Branch appears to substitute the specific challenged claims in his Complaints for certain of the general administrative claims previously mentioned in his Proofs of Claim. In the BNE Proof of Claim, for example, Branch includes an administrative claim seeking recovery for the transfer of over $203 million in undefined "additional substantial sums of cash (or other liquid assets) to BNE"—a claim which potentially encompasses several of Branch's challenged claims (e.g., the BNE Tax Refund, McCullagh Leasing, New England Servicios Limitada, and Bank of Tokyo claims). Then, in the BNE Complaint, Branch adds the specific challenged transactions, but drops his $203 million claim for the transfer of undefined cash or other liquid assets (leaving only a valueless claim for recovery of

other potential but as yet undiscovered transfers [the catch-all claim]). Thus, it appears that the challenged transactions are to some extent merely specific restatements of the general administrative transactions described in Branch's Proofs of Claim. Similar scenarios are played out with regard to the other challenged transactions.

9. Although in Branch's tax refund claim the calculation of the dollar amount of overpayment appears to involve interpretation of tax publications and principles of intercorporate tax sharing arrangements, (*see* Mass.Compl. ¶ 101), Branch's underlying theory of recovery for the overpaid funds remains the same (the fraudulent conveyance provisions of the Bankruptcy Code and state common law).

judgment with respect to the "no compete" claim. *Id.* at 275. Again, however, the case at bar is distinguishable since Branch's claims are based not upon contractual provisions, but upon the general pattern of transfers made while BNEC and BNE were insolvent, each transaction giving rise to the same legal theories of recovery. Accordingly, neither *Hibyan* nor *Coleman* impedes the conclusion that Branch's Proofs of Claim sufficiently stated his challenged claims.

Finally, the adequacy of Branch's administrative claims is further buttressed by the FDIC's broad-based denials of those claims, based upon grounds clearly applicable to all downstream transfers made from BNEC to the Subsidiary Banks. In light of these sweeping denials, the FDIC clearly needed no further information to determine whether to pay in full, settle, or disallow any or all of Branch's claims, including the challenged claims. *Cf. Office & Professional Employees*, 962 F.2d at 69 (although the names and addresses of bargaining unit employees were omitted from a union's claim on behalf of employees, "the identity of the claimants and the nature of their claims were sufficiently clear to FDIC"). In addition, because Branch specifically stated in his Proofs of Claim that his claims were not limited to the specific transactions listed, the FDIC cannot now be heard to complain that it was misled concerning the potential scope of Branch's claims.

In sum, the Court rules that Branch's administrative claims sufficiently encompassed the challenged claims so as to provide the FDIC with adequate notice of the challenged claims and with sufficient information about the claims to enable it expeditiously to determine whether to allow or disallow the claims. Accordingly, the Court rules that Branch has adequately exhausted his administrative remedies with respect to the challenged claims.

## CONCLUSION

The FDIC's motion to dismiss Branch's claims for failure to exhaust administrative remedies under FIRREA is denied.